Breen v. Dewey.

ELIZABETH BREEN,

*vs.*

JOHN J. DEWEY and ELIZABETH A. DEWEY, his wife.

The acts of congress of 1862 and 1863, making United States notes a legal tender in payment of debts, so far as they apply to debts contracted after their passage, not specifically payable in coin, but payable generally in dollars, are constitutional.

A tender of United States legal tender notes in payment and discharge of a contract executed subsequent to the passage of the legal tender acts of 1862 and 1863, not specifically payable in coin, but payable generally in dollars, is good.

This action was brought in the court of common pleas of

Breen v. Dewey.

Ramsey county, to compel the specific performance by the defendants of a contract to convey lands in that county. The cause having been tried by the court without a jury, the judge found the facts as follows: On the first day of June, 1867, the defendants executed and delivered to the plaintiff a bond and agreement for a warranty deed of the premises described in the complaint, which were the separate property of the defendant Elizabeth A. Dewey. The consideration to be paid by the plaintiff was three hundred and seventy-five dollars. Of this sum a portion was paid by the plaintiff upon the execution of the bond, and for the remainder a promissory note was given, dated June 8th, 1867, and payable one year thereafter, with interest at twelve per cent. per annum after maturity. It was understood between the parties, that time was not of the essence of the contract. In June, 1869, the plaintiff was notified by the defendants that they desired the payment of the amount due upon the note and agreement, and on the 8th June, 1869, the plaintiff tendered to the defendants and both of them, the full amount, principal and interest, due upon the note and agreement. The tender was made in United States treasury notes and was declined by the defendants because not made in coin, and the defendants then and there notified the plaintiff that unless the amount then due on the note and agreement was paid in coin within ten days thereafter, then the defendants would deem the bond of no effect. Together with the treasury notes the plaintiff also tendered to the defendants a proper warranty deed to be executed by them, which they refused to execute. The plaintiff had paid into court the amount of her tender. Since the date of the bond, the plaintiff had been in possession of the premises, had paid all taxes assessed thereon, and had made valuable improvements, with the knowledge of the defendan

As conclusions of law the judge found that the plainti£ had never made any legal tender of the amount due on the note or agreement; but that upon paying to a referee appointed by the court the amount found by him to be due upon the note and agreement, in gold or silver coin, within sixty days from the filing of the decree in this action, the plaintiff should be entitled to a decree for a deed of the said premises; and that, upon failure of the plaintiff to make such payment, the defendants should be entitled to a decree directing the cancellation of the bond, &c., as prayed in their answer.

The plaintiff moved in the court below for a new trial, and appeals to this court from the order denying such motion.

LAMPREYS for Appellant.

SMITH & GILMAN for Respondents.

*By the Court*—McMILLAN, J.—The agreement for the sale of the land, and the note for the payment of the balance of the purchase money in this case, were both made, and each dated on the 8th day of June, 1867. The whole transaction, therefore, is subsequent to the passage of the acts of congress making treasury notes of the United States a legal tender in payment of debts. Neither the agreement nor the note stipulate in terms for the payment or delivery of coin or bullion; but, by the condition of the agreement and the terms of the note, the purchase money is payable generally in dollars.

The objection, therefore, to the constitutionality of the laws of congress commonly known as the legal tender acts, on the ground of impairing the obligation of contracts; or, that congress has not power to make notes issued under its

authority a legal tender in payment of pre-existing debts, is not applicable to this case; nor can it be said that the contract under consideration provides expressly for the payment or delivery of coin, and for that reason is not within the operation of the acts of congress; (*See Butler vs. Horwitz*, 7 *Wallace*, 258.) Nor is there any doubt that, so far as the terms of the laws referred to are concerned, this contract is embraced within them. *Hepburn vs. Griswold*, 8 *Wallace*, 603. If, therefore, the law is constitutional, the notes tendered in payment were, at the time the contract was executed, and at the time the tender was made, lawful money and a legal tender in payment and discharge of the debt, and the tender was good. The only question then for our determination in this case is, whether congress had power, under the constitution, to make the notes issued under its authority a legal tender in payment of debts, not specifically payable in coin, contracted subsequent to the passage of the laws referred to.

The constitution contains no express grant of power to congress, either to issue these notes, or to make them a legal tender; if, therefore, the power exists to do either of these acts, it is one of "the implied or auxiliary" powers granted under that clause in the constitution which grants to congress the power to make laws which shall be necessary and proper for carrying into execution the powers expressly granted by *section* 8, *of art*. 1, of the constitution, and all other powers vested by the constitution in the government of the United States, or in any department or officer thereof. This clause of the constitution was the subject of consideration by the supreme court of the United States in the case of *Hepburn vs. Griswold*, *cited ante*, and it was decided in that case, by a majority of the court, that the words, "all laws necessary and proper for carrying into execution" powers expressly granted or vested, have in the

constitution a sense equivalent to that of the words, "laws, not absolutely necessary, indeed, but appropriate, plainly adapted to constitutional and legitimate ends; laws not prohibited, but consistent with the letter and spirit of the constitution; laws really calculated to effect objects intrusted to the government." Whatever our views may be of the decision in *Hepburn vs. Griswold*, so long as it stands it is binding upon us, and must be followed in this case. If, therefore, making these notes a legal tender in payment of subsequent debts was a means appropriate and plainly adapted to the execution of any of the powers granted by the constitution, and is not prohibited therein, congress had the power to do so, and the acts of congress exercising that power are constitutional.

The power of congress to issue these notes, without making them a legal tender, and the legislation during the war authorizing their issue to the amount, in the form, (except the legal tender clause,) and for the purposes they were issued, have been sustained by several decisions of the supreme court. Chief Justice Chase, in delivering the opinion of the majority of the court in the case of *Hepburn vs. Griswold*, says: "No one questions the general constitutionality, and not very many, perhaps, the general expediency of the legislation by which a note currency has been authorized in recent years." And in *Veazie Bank vs Fenno*, 8 *Wallace*, 534, the same learned chief justice says, in speaking of the power of congress to emit bills of credit,       *       *       "it is enough, to say that there can be no question of the power of the government to emit them,       *       *       to fit them for use by those who see fit to use them in all the transactions of commerce; to provide for their redemption; to make them a currency uniform in value and description, and convenient and useful for circulation.

Breen v. Dewey.

"These powers, until recently, were only partially and occasionally exercised. Lately, however, they have been called into full activity, and congress has undertaken to supply a currency for the entire country. Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it cannot be questioned that congress may constitutionally secure the benefit of it to the people by appropriate legislation. To this end congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community. To the same end congress may restrain by suitable enactments the circulation as money of any notes not issued under its own authority. Without this power, indeed, its attempt to secure a sound and uniform currency for the country must be futile."

The power to issue bills of credit is not among the powers expressly granted to the government in the constitution. It is undoubtedly an "implied or auxiliary" power, vested under the clause of the constitution referred to, granting the power to make "laws necessary and proper for carrying into execution the powers expressly granted or vested in the government." The power, therefore, to issue the notes authorized by recent legislation, to the amount and in the manner they were issued, (without a legal tender clause,) and thus provide a currency for the whole country, and secure the benefit of it to the whole people by appropriate legislation, must have been, at the time and under the circumstances it was exercised, "necessary and proper" within the meaning of the constitution as construed by the court in the case of *Hepburn vs. Griswold*.

Was it, then, at that time and under the same circumstances, appropriate legislation to make a portion of these notes a

legal tender in payment of debts subsequently contracted, not specifically payable in coin?

The condition of the country at the time the legal tender acts were passed, is well described by Mr. Justice Miller in the dissenting opinion in *Hepburn vs. Griswold.* After enumerating certain powers expressly granted by the constitution to the government, he says: " We were in the midst of a war which called all these powers into exercise and taxed them severely. A war, which, if we take into account the increased capacity for destruction introduced by modern science, and the corresponding increase of its cost, brought into operation powers of belligerency more potent and more expensive than any that the world has ever known. All the ordinary means of rendering efficient the several powers of congress above mentioned had been employed to their utmost capacity, and, with the spirit of the rebellion unbroken, with large armies in the field unpaid, with a current expenditure of over a million of dollars per day, the credit of the government nearly exhausted, and the resources of taxation inadequate to pay even the interest on the public debt, congress was called on to devise some new means of borrowing money on the credit of the nation; for the result of the war was conceded by all thoughtful men to depend on the capacity of the government to raise money in amounts previously unknown.

" The banks had already loaned their means to the treasury. They had been compelled to suspend the payment of specie on their own notes. The coin in the country, if it could all have been placed within the control of the secretary of the treasury, would not have made a circulation sufficient to answer army purchases and army payments, to say nothing of the ordinary business of the country. A general collapse of credit, of payment, and of business,

seemed inevitable, in which faith in the ability of the government would have been destroyed, the rebellion would have triumphed, the states would have been divided, and the people impoverished." These are the circumstances which made the issues of the United States notes necessary, and authorized the government to provide them as a currency for the whole nation.

Did the clause making them a legal tender in payment of debts add anything to their value as a circulating medium?

At the time they were issued the gold and silver coinage was the money standard; it was the only legal tender; it only could be used for all the purposes of money; it was also intrinsically valuable, and could be used without serious depreciation throughout the world. The United States notes have no intrinsic value; they possess only the value imparted to them by the action of the government promising to pay the face amounts of the notes, and imparting to them the character of money. Measured by the standard of gold and silver money and their immediate convertibility into it, their value will depend upon the time, terms, and certainty of payment, and the depreciation of the notes will be greater or less in proportion as the time of payment is more or less remote, the terms more or less favorable, and the payment uncertain or certain.

But these notes were issued and intended not only as securities for a loan to the government, but as a circulating medium for the whole country, to be used in all the transactions of commerce. As such their value depends not alone on their immediate convertibility into coin, but also in a great degree upon their efficiency as such circulating medium; for although such convertibility may be remote, yet it may be certain. If, until the period for such convertibility arrives, they can be used by the whole nation as a

circulating medium, their value must be greatly increased; for just to that extent will they supersede the use of gold and silver. If they cannot be used for any purpose as money, as they bear no interest, they must be comparatively valueless to the people; but if they can be used as money for all the purposes for which gold can be used as money, they must for such purposes be as valuable as coined money. It is evident, therefore, that their value as a circulating medium will be greater or less in proportion to the extent and variety of commercial purposes to which they can be applied.

Cash transactions constitute but a small portion of the commercial transactions of the country. A vast portion of the business of the country is done upon credit more or less extensive as to time. The payment of debts, therefore, is a most important element in the value of these notes. If they can be used in payment of debts their value will undoubtedly, it seems to us, be greatly enhanced as a circulating medium, otherwise greatly impaired. The fact that these notes were convertible into, or receivable at par for bonds payable in coin, and bearing coin interest at a rate not less than five per cent., and for all debts due to or from the government except duties on imports, and interest on the public debt, while it contributed materially to their value, would not secure their efficiency as a circulating medium, for these are but few of the purposes of commerce.

But it may be said that these and other provisions made by the government, together with the withdrawal of gold and silver from circulation, would assure the circulation of the notes for all the purposes of commerce, including the payment of debts, by the voluntary consent of the people. It might have that tendency; but still, in all cases where executory payments were to be made, in all commercial

Breen v. Dewey.

transactions based in whole or in part on credit, it would leave the debtor at the mercy of the creditor, and the latter would in all such cases demand gold and silver in payment of his debt. Gold having been withdrawn from general circulation, and United States notes constituting the basis upon which commercial transactions were carried on, the credit given and indebtedness incurred, with notes greatly depreciated from the standard of gold, to the rate in July, 1864, of "two dollars and eighty-five cents for a dollar in gold," to require payment of debts in gold, instead of notes would inevitably have brought ruin and disaster upon the whole country; yet, without the legal tender clause, this could have been required at any moment during the war. This was a risk too great to be incurred; the voluntary assent of the people was not a sufficient protection against it.

These notes, necessarily issued, became the principal circulating medium of the whole country; they became practically a standard of value by which all commercial values were regulated. As the note money standard of value was lower than that of the gold and silver standard, an appreciation of all other values from the coin standard, to the extent of the difference between these two standards, necessarily followed, and all subsequent contracts and indebtedness were made and incurred with reference to the note money standard. The interests of commerce required that, as to such transactions, this standard should not be changed, but that it should be recognized and established as a legal standard; otherwise great injuries must have resulted to individuals, and the business of the country must have been greatly impaired. This was effected by that clause in the laws making these notes a legal tender in payment of debts. So far, therefore, as transactions subsequent to the passage of these laws are concerned, we think

the legal tender clause was necessary and proper in the strictest sense of these words, to secure to the country the benefit of the note currency thus necessarily issued by the government in the exercise of its express power to borrow money. But, if not absolutely necessary, it was clearly a means appropriate, plainly adapted and really calculated to effect that object.

Was the government benefited by this legal tender clause? These notes are bills of credit—securities of the government —by which it obtained a loan to the amount of their face value from the people, without interest, and for an indefinite time. If we are correct in the position that the legal tender clause materially enlarged the purposes for which they could be used, and more fully adapted and secured them to the whole country as a circulating medium and standard of value, the people, it seems to us, would receive them more readily, retain them longer, and be much less inclined to convert them into interest-bearing gold bonds of the government. If so, the government was thereby materially benefited and aided both as to the time and terms in borrowing money, and was better enabled to pay the debts of the nation and sustain its credit; a serious obstacle to enlisting in the army and navy was obviated; voluntary enlistments in both were encouraged, and the government was thus enabled, at least more fully, to exercise its powers to raise and support armies, to carry on war, and to suppress insurrection.

We are, therefore, of opinion that making the United States notes a legal tender in payment of private debts subsequently contracted was a means appropriate, plainly adapted, and really calculated to carry into effect the powers of the government to borrow money, to raise and support armies, to provide and maintain a navy, to suppress insur-

Breen v. Dewey.

rection, and perhaps other powers expressly vested by the constitution in the government of the United States   The power to make these notes a legal tender in payment of debts subsequently contracted is not expressly prohibited, and, certainly, so far as it applies to subsequent debts not specifically payable in coin, which is the case at bar, it in no way impairs the obligation of contracts, and we think is consistent with the letter and spirit of the constitution.   Our conclusion, therefore, is that the acts of congress of 1862 and 1863, making United States notes a legal tender in payment of debts, so far as they apply to debts contracted after their passage and payable generally in money, are valid and constitutional.

There were, then, at the time this contract was executed and the tender made, two kinds of lawful money—coin and notes—both of which were legal tender.   As the contract does not in terms stipulate for payment in coin, but generally in dollars, it is payable in any lawful money which was a legal tender.   A tender, therefore, in United States legal tender notes was sufficient.   The tender in this case was good and remains good; the plaintiff is, therefore, entitled to a decree for the specific performance of the contract. The order denying a new trial is reversed.